NOT DESIGNATED FOR PUBLICATION

No. 125,849

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

AWNTERIO DWAN LOWERY,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; NANCY E. PARRISH, judge. Submitted without oral argument. Opinion filed October 18, 2024. Affirmed.

*David L. Miller*, of The Law Office of David L. Miller, of Wichita, for appellant.

*Jodi Litfin*, deputy district attorney, *Michael F. Kagay*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before GARDNER, P.J., GREEN and HILL, JJ.

PER CURIAM: Awnterio Dwan Lowery appeals the district court's denial of his K.S.A. 60-1507 motion. He argues that his trial counsel was ineffective, alleging eight instances of deficient performance plus cumulative error. For the reasons set forth later, we affirm the district court's denial of Lowery's K.S.A. 60-1507 motion.

1

A jury convicted Lowery of premeditated first-degree murder of Tiffany Davenport-Ray, attempted premeditated first-degree murder of Melvin Ray, criminal discharge of a firearm at an occupied dwelling, possession of cocaine, unlawful use of drug paraphernalia, and possession of marijuana. *State v. Lowery*, 308 Kan. 1183, 1192, 427 P.3d 865 (2018). Our Supreme Court stated the facts as follows:

"In the afternoon of May 24, 2014, Ray and Davenport-Ray were married at Faith Temple Church in Topeka, Kansas. A reception followed at the Topeka Performing Arts Center (TPAC), after which the couple met family and friends at the Elks Lodge. Around 1:30 a.m. the couple left the Elks Lodge to go to a restaurant to eat, accompanied by Terrance Smith, who was catching a ride to Ray's aunt's house. Ray drove a Dodge Charger; Davenport-Ray sat in the front passenger seat, and Smith was on the driver's side of the backseat. The shooting incident occurred enroute and was described differently by the trial witnesses.

"According to Ray, while at a stop sign at 13th and Kansas, he noticed a sport utility vehicle (SUV) behind him. He did not recognize the SUV but was unconcerned because he assumed it was a rental car driven by an out-of-town wedding guest. Ray turned South onto Kansas Avenue, proceeded to the far right-hand lane, and crossed 17th Street when Davenport-Ray leaned her seat back and put her head on Ray's shoulder. As he was leaned over talking to Davenport-Ray, Ray heard a window 'explode.' He hit his brakes, noticed the SUV next to his Charger, saw muzzle flash coming from the SUV's front passenger seat, and heard a rapid succession of gunshots. Ray took Davenport-Ray's pistol from the center console and returned fire into the SUV two to three times. After Ray shot back, the SUV lost control, swerved in front of the Charger, went onto the sidewalk, and crashed into a pole, albeit shots continued to come from the SUV even after the driver lost control. Ray turned onto 19th Street and asked if everyone was okay; however, Davenport-Ray did not respond. Because Davenport-Ray was shot and covered with blood, Ray drove to Stormont-Vail Hospital.

"Ray explained that, at the hospital, he could not get the Charger's passenger side door open, so he pulled Davenport-Ray out of the driver's side. After going inside to get help, Ray told Smith to stay with Davenport-Ray and then left for an apartment complex

2

where he thought a relative lived. In the meantime, Davenport-Ray died at the hospital from a deep graze gunshot wound that carried across her forehead.

"Police apprehended Ray outside of the apartment complex and took him to the Topeka Law Enforcement Center (LEC) for questioning. Ray testified that he initially lied to the police about shooting back at the SUV because he is a felon and was not allowed to possess a firearm. Eventually, he admitted to returning fire and said he left the handgun in the Charger; the police did not find the weapon.

"Smith's version of the shooting related that he noticed an SUV come from behind the Charger, on the left side, and as Smith tilted over to lay down in the back seat, glass hit him in the face as he heard a gunshot. He ducked down for cover and heard other gunshots coming from '[b]eside [him] on the side that [he] was on.' Smith said that he did not fire a weapon and did not see anyone else fire from within the Charger.

"The first 'shots fired' 911 call was received at 1:43 a.m. Multiple gunshots fired in rapid succession drew police to the area. Officer Samuel Cartmill testified that when he arrived, he saw a person, later identified as Lowery, running west down 19th Street and heard the citizen that resided at 1900 South Kansas yell that the runner was the driver of the SUV. Officer Brandon Uhlrig also pursued Lowery, eventually catching him, but not before Lowery had thrown a bag containing cocaine, marijuana, and a lighter over the fence of a car dealership. Lowery was handcuffed and placed in a patrol car, where Officer Cartmill elicited Lowery's statement that he was the driver of the wrecked SUV.

"Lowery was transported to the LEC and interviewed by Detective Scott Dickey who was joined during part of the interview by Sergeant Richard Volle. During the interview, Lowery again admitted driving the SUV and running away after he wrecked the SUV. He said the wreck was caused by another car trying to 'swerve [him] off the lane.' Lowery said there was only one passenger in the SUV, whose name was 'Kevin.' He did not know Kevin but had agreed to give him a ride. Lowery denied that anyone in the SUV was shooting and declared that he had no idea who shot the woman in the other vehicle. He said that because things happened so fast, he did not know what transpired after he wrecked the SUV.

"The police were told that two men had run west from the wrecked SUV, although those persons were not apprehended on the date of the incident. A later tip related that the two men had run to Tashara Yeargin-Charles' residence. After receiving a grant of immunity, Yeargin-Charles testified at trial that Thomas Brown, Jr., also known as 'T-Black,' and Jermel Robbins, also known as 'B.G.,' came to her residence in the early

morning hours of May 25, 2014. The Shunga Creek separated Yeargin-Charles' residence from the SUV crash site, and, although she denied it at trial, a law enforcement officer testified that Yeargin-Charles had reported that Brown and Robbins were soaking wet when they arrived at her residence.

"Police also gathered physical evidence from both vehicles and from the surrounding area. The Charger was struck by bullets five to six times, and trajectory paths appeared to show a shot that went slightly from the back to the front of the Charger, one that went nearly straight across the passenger compartment, and one that went from the front to the back. Although the police did not find a weapon in the Charger, a .9 millimeter shell casing was found in the driver's seat.

"The SUV had one bullet hole entering the passenger side rear door; however, no bullet was found. Both the rear and front passenger side windows were down, and the side curtain airbags were deployed. Two bullet holes in the passenger side front airbag had burn marks indicting that the rounds were fired from inside the vehicle after the airbag had deployed. Lowery's identification and debit cards were found in the SUV's center console, which also contained plastic baggies of cocaine. The back of the SUV contained a shopping bag from City Trends. A Springfield Armory .45 caliber weapon was retrieved from the floorboard of the SUV. The 13-round magazine contained 10 live rounds; 1 round was jammed in the breech of the weapon, indicating a spent cartridge had failed to eject. Investigators cleared the jam and test-fired the weapon four times. The handgun jammed each time, leading the Crime Scene Investigator (CSI) to opine that the weapon could only fire one round at a time. The CSI could not say whether that weapon had been fired on the date of Davenport-Ray's death.

"A house located at 1911 South Kansas, just south of where the SUV wrecked, was struck by gunfire. The resident at that address testified that around 2 a.m., she heard gunshots, yelling, and a car crash. She felt something on her leg, which she thought were pieces of paint from her house. A bullet was found inside the house, and there was a bullet hole on the north side of the house, about 50 to 75 feet from the SUV, that was in a direct line from the bullet holes in the SUV's passenger side airbag.

"Five .45 caliber casings were found at the crime scene, two in a nearby business driveway, two near the SUV, and one in the front passenger door of the SUV. A Forensic Toolmark and Firearm Examiner testified that all five casings were fired from the same .45 caliber firearm; however, they were not fired from the Springfield firearm found in the SUV.

4

"A piece of latex glove was found in the SUV's rear passenger door handle, and Robbins could not be excluded as the source of the DNA profile found on that glove. The probability of randomly selecting an unrelated individual from the population with this DNA profile is 1 in 7.360 quintillion. Latex gloves were retrieved near a fence in a lot that was on the path the two males were reported to have run after the SUV crash. Brown could not be excluded as the source of the DNA profile found on one of these gloves. The probability of randomly selecting an unrelated individual from the population with this DNA profile is 1 in 1.737 quadrillion. Lowery could not be excluded as the source of a partial DNA profile consisting of one allele on one of the latex gloves, although Robbins and Brown were excluded. The probability of randomly selecting an unrelated individual from the population with this single allele is 1 in 4. Likewise, Lowery could not be excluded as the source, or one of the sources, of the DNA profile found on the following items (with corresponding probabilities): a swab from the steering wheel airbag (1 in 1.2496 trillion); a ball cap found on the driver's side floorboard of the SUV (1 in 11.14 quintillion); a head scarf (do-rag) found in the glove box (1 in 28.81 quintillion); the Springfield handgun and magazine (1 in 12); a Samsung Touch cellular telephone found in the SUV (1 in 4); and the chain link fence on the escape path (1 in 2).

"Ray testified that the only motive for the shooting that he could imagine was that he had heard that Lowery and Brown were related to Andre Baker, who had been killed in 2006. Ray's name had surfaced during that investigation, although he was never arrested or charged with killing Baker. Ray said he had known Robbins since Robbins was a child. Robbins died from a gunshot wound less than three weeks after Davenport-Ray's murder.

"Lowery's version of events was presented through his testimony at trial. He explained that, at the time of the events in question, he lived in Oklahoma but was in Topeka visiting family for Memorial Day. He had traveled to Topeka in an SUV his girlfriend had rented earlier in the week, arriving at his aunt's house in the early morning hours on Saturday, and then slept until that afternoon. Around 4 p.m., Lowery's friend Patesse Burns came to his aunt's house and the two took the SUV to Kansas City to shop at the clothing store City Trends and eat dinner. They returned to Topeka and arrived at Burns' residence at 8th and Western around 10:30 or 11 p.m., where Lowery watched television until approximately 12:30 a.m. As Lowery was leaving Burns' residence to go to his aunt's house, Brown called him and asked for a ride to 35th and Adams. Lowery picked up Brown and another man, who Lowery later learned was Robbins, about a block

away at 8th and Taylor. At the time, Lowery did not know Robbins, who introduced himself as 'Kev.'

"After picking up Brown and Robbins, Lowery was driving south on Kansas Avenue when he noticed a car, later identified as the Charger, in front of him at a stoplight at 17th and Kansas. Lowery did not recognize the Charger and did not know who was in it. As he approached the intersection, the stoplight turned green, and Lowery drove around the slow-driving Charger on the left. As he went around, a shot was fired at the SUV. Lowery ducked and tried to turn the vehicle to the left, but the SUV swerved right and hit the curb and the pole, and Lowery was knocked unconscious.

"Lowery testified that he awoke afraid and panicked; his passengers were gone. He exited the SUV through the passenger window, hitting his head on the concrete outside. Seeing headlights that he assumed were from the Charger, Lowery said he ran toward the chain-link fence, jumped over it, and turned back onto 19th Street. When he heard an engine revving toward him, he threw away the marijuana, crack, and lighter in his pocket. Shortly thereafter, the police arrested him. Lowery denied shooting at the Charger and said he did not know his passengers were going to start shooting.

"Jake Sutton, the limousine driver from the Davenport-Ray wedding, testified for the defense. Sutton was waiting by his limousine at the church when he observed a visibly upset man come out of the church. The man was talking with a couple about a confrontation in the church, and Sutton heard the man say there was going to be a wedding and a funeral on the same day. He also heard the man say he could have his 'boys' there. Sutton did not think the upset man was part of the wedding party, but Sutton saw a member of the wedding party, known as 'Danger,' respond to the upset man and tell him everything was good. Further, between the wedding and the reception, Sutton was driving the wedding party when he overheard a female passenger say that if someone shows up, there was going to be a fight. Sutton did not know who the female passenger was referring to. Although Sutton was concerned about the safety of the people at TPAC, he did not act on his concerns that night. The following day, when he heard the news about the shooting, he filed a police report.

"A wedding guest, Geondra Powell, told a detective she was aware that there was an argument at the wedding and that people outside of the church were upset. Powell believed the two men involved in the disturbance were Lamont Taylor (one of Ray's groomsmen) and a man with the possible alias of 'Dank.' During the State's evidence, Sergeant Josh Klamm had testified that he was aware that an argument took place

6

between 'Danger,' who he believed to be Lamont Taylor, and 'Dank,' who he believed to be Daniel Martin.

"During his testimony, Lowery said that an iPhone found in the SUV belonged to him. In the State's rebuttal, Detective Patrick Ladd testified about evidence extracted from the iPhone and from a Samsung phone found in the SUV. An unrelated text from the Samsung phone stated, 'this T BLK. Call me later.' Detective Ladd related several communications between Lowery's iPhone and the Samsung phone from May 24th and 25th. On May 24th, at 8:10 p.m., the Samsung phone called Lowery's iPhone. At 8:15 p.m., Lowery's iPhone received a text from the Samsung phone stating, 'Man cuz don't spin me NEED ya right now.' At 8:31 p.m., Lowery's iPhone texted back, 'Wass [sic] good.' At 8:32 p.m., the Samsung phone called Lowery's iPhone. At 8:32 p.m., the Samsung phone texted Lowery's iPhone, 'Where you at?' At 8:42 p.m., Lowery's iPhone sent a text to the Samsung phone stating, '30 min.' At 10:06 p.m., Lowery's iPhone called the Samsung phone. And at 10:27 p.m., 12:34 a.m., and 12:39 a.m., the Samsung phone called Lowery's iPhone.

"Detective Ladd also testified regarding location history for Lowery's iPhone based on applications (apps) used. He explained that when a person accesses an iPhone app, the app determines your Global Positioning System (GPS) location. Without objection, the State entered exhibits showing 22 app locations between May 24th at 12:53 p.m. and May 25th at 12:26 a.m. This data showed a 70% confidence factor that Lowery's iPhone was located at 1208 Southwest Munson in Topeka, the address of the Faith Temple Church where Ray and Davenport-Ray were married, at 1:15 p.m. on May 24th. The confidence factor, or certainty level, was determined by software, and Detective Ladd did not know how it was calculated.

"Detective Ladd additionally testified about Lowery's location based on cell phone tower data derived from text messages, voice calls, and SMS traffic from Lowery's iPhone. He explained that the cell phone towers at issue were each connected to three antennas. Each antenna covers a 120-degree radius of the tower and produced sector lines going out from the tower. The antennas in the Topeka area have a normal range of 40 to 60 miles. The State admitted exhibits that Detective Ladd testified showed Lowery's iPhone utilizing a cell phone tower sector at 12:21 a.m. that did not include the vicinity of 8th and Taylor or 8th and Western. The State additionally admitted exhibits through Detective Ladd's testimony that showed Lowery's cell phone utilizing a cell phone tower sector covering the Elks Lodge each time the iPhone was utilized from 12:34 a.m. to

1:44 a.m. on May 25th. The cell phone tower sector utilized by Lowery's iPhone during this time also covered 19th and Kansas but did not cover the area of 8th and Taylor or 8th and Western.

"In surrebuttal, Lowery called Burns who testified that she traveled to Kansas City with Lowery on May 24th. Burns testified that after returning from Kansas City, Lowery watched television at her residence and left around 10:30 p.m. to go to his aunt's house.

"The jury found Lowery guilty as charged of premeditated first-degree murder, attempted premeditated first-degree murder, criminal discharge of a firearm, possession of cocaine, possession of marijuana, and unlawful use of drug paraphernalia. The district court imposed a hard 25 life sentence for Lowery's premeditated first-degree murder conviction and a 620 months' imprisonment term for the attempted first-degree murder conviction to run consecutive to the life sentence; the sentences on the remaining counts were imposed concurrently." 308 Kan. at 1185-93.

After our Supreme Court affirmed Lowery's convictions, he filed a K.S.A. 60-1507 motion alleging ineffective assistance of counsel. The district court granted an evidentiary hearing. The parties submitted post-hearing briefs. The district court denied Lowery's motion. Lowery moved the district court to reconsider, which the district court also denied.

Lowery timely appeals.

ANALYSIS

I. *Was trial counsel ineffective for failing to object to testimony from David and LeeAnn Carroll?*

Lowery argues that his trial counsel was ineffective because witnesses for the State violated an order in limine and counsel failed to object or move for a mistrial. The State argues that it did not violate the order in limine, that defense counsel's performance was not ineffective, and that Lowery fails to show prejudice.

8

A district court has three options when handling a K.S.A. 60-1507 motion:

> "'(1) The court may determine that the motion, files, and case records conclusively show the prisoner is entitled to no relief and deny the motion summarily; (2) the court may determine from the motion, files, and records that a potentially substantial issue exists, in which case a preliminary hearing may be held. If the court then determines there is no substantial issue, the court may deny the motion; or (3) the court may determine from the motion, files, records, or preliminary hearing that a substantial issue is presented requiring a full hearing.' [Citations omitted.]" *State v. Adams*, 311 Kan. 569, 578, 465 P.3d 176 (2020).

The standard of review depends upon which of these options a district court used. 311 Kan. at 578.

After a full evidentiary hearing on a K.S.A. 60-1507 motion, the district court must issue findings of fact and conclusions of law concerning all issues presented. Supreme Court Rule 183(j) (2024 Kan. S. Ct. R. at 242). An appellate court reviews the court's findings of fact to determine whether they are supported by substantial competent evidence and are sufficient to support the court's conclusions of law. Appellate review of the district court's ultimate conclusions of law is de novo. *Khalil-Alsalaami v. State*, 313 Kan. 472, 486, 486 P.3d 1216 (2021).

To be entitled to relief under K.S.A. 60-1507, the movant must establish by a preponderance of the evidence either: (1) "the judgment was rendered without jurisdiction"; (2) "the sentence imposed was not authorized by law or is otherwise open to collateral attack"; or (3) "there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack." K.S.A. 2023 Supp. 60-1507(b) (grounds for relief); see also Supreme Court Rule 183(g) (preponderance burden).

9

In reviewing a district court's decision on claims of ineffective assistance of counsel, appellate courts review the district court's factual findings using a substantial competent evidence standard. Appellate courts review the district court's legal conclusions based on those facts applying a de novo standard of review. *State v. Evans*, 315 Kan. 211, 218, 506 P.3d 260 (2022).

Claims of ineffective assistance of trial counsel are analyzed under the two-prong test articulated in *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), and adopted by the Kansas Supreme Court in *Chamberlain v. State*, 236 Kan. 650, 656-57, 694 P.2d 468 (1985). Under the first prong, the defendant must show that defense counsel's performance was deficient. If successful, the court moves to the second prong and determines whether there is a reasonable probability that, absent defense counsel's unprofessional errors, the result would have been different. *Evans*, 315 Kan. at 217-18.

To establish deficient performance under the first prong, the defendant must show that defense counsel's representation fell below an objective standard of reasonableness. Judicial scrutiny of counsel's performance in a claim of ineffective assistance of counsel must be highly deferential. A fair assessment of counsel's performance requires that every effort be made to eliminate the distorting effects of hindsight, reconstruct the circumstances surrounding the challenged conduct, and evaluate the conduct from counsel's perspective at the time. *Evans*, 315 Kan. at 218. A court considering a claim of ineffective assistance of counsel must strongly presume that defense counsel's conduct fell within the wide range of reasonable professional assistance; that is, the defendant must overcome the strong presumption that, under the circumstances, counsel's action might be considered sound trial strategy. *Khalil-Alsalaami*, 313 Kan. at 486.

Under the second prong, the defendant must show that defense counsel's deficient performance was prejudicial. To establish prejudice, the defendant must show with

reasonable probability that the deficient performance affected the outcome of the proceedings, based on the totality of the evidence. A court hearing a claim of ineffective assistance of counsel must consider the totality of the evidence before the judge or jury. *Khalil-Alsalaami*, 313 Kan. at 486. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Evans*, 315 Kan. at 218.

Strategic choices made by counsel after a thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable. Strategic choices made after an incomplete investigation can fall within the wide range of reasonable professional assistance if the decision to limit the investigation is supported by reasonable professional judgment. *State v. Hutto*, 313 Kan. 741, 750, 490 P.3d 43 (2021).

Lowery first complains that trial counsel did not object to testimony which suggested that Lowery's associates intimidated witnesses. Trial counsel Gary Conwell moved the district court to prevent the State from mentioning Lowery's previous convictions, specific instances of crime or civil wrong, and Lowery's character. The district court granted the motion.

At trial, the State called David and LeeAnn Carroll to testify because they lived near the shooting and witnessed some of the events. David testified that he took video of the accident scene after the occupants fled the vehicle. David testified that he spoke with law enforcement, newspaper reporters, television reporters, and gave his video to the press. Without objection, David testified that he was contacted by "people who know what was going on and some of the people who did it." When pressed by the prosecutor, David said the visitors belonged to "a larger association than me," and they were "Mr. Lowery's homeboys." He explained that a male and a female came to his house, and the male became violent with the female but was unsure of whether to describe this violence as a demonstration. David stated that the incident made it more difficult for him and his wife to testify and was the reason they no longer lived in Topeka.

11

LeeAnn testified after her husband. She also testified that two people came to their house after the shooting. She assumed that these people knew her husband because he worked maintenance at several rental properties. LeeAnn testified that the man's name was "'Tito.'" She did not think it was his real name but "would assume" it was a street-type nickname. The Carrolls told their visitors about what they witnessed, and the man got violent with the woman. LeeAnn did not know whether the man was associated with anyone in this case. LeeAnn said that the visit did not cause her any concern as far as testifying at trial. She described the visitors as "undesirables" and "thugs."

At the evidentiary hearing on this K.S.A. 60-1507 motion, Conwell testified about why he did not object to testimony from the Carrolls. First, Conwell "didn't think it caused us any problems with the case." And second, Conwell "didn't want to point it out to make people more particularly aware of what 'a larger association' was." He also felt like he could cover it in cross-examination. But Conwell stated that the prosecutor violated the district court's order in limine. He viewed it as against the order in limine for the prosecutor to connect Lowery with the attempted intimidation through his "home boys" and his alleged association with "thugs."

Conwell explained why he did not think David's testimony caused problems for Lowery as follows:

> "I didn't think it came out necessarily against Mr. Lowery. There were other individuals in that SUV that I knew had belonged to gangs. My understanding, Mr. Lowery wasn't part of the gang, so it could've been a number of people from different associations. So, no, I didn't think it was—I didn't think it was prejudicial. That was the least of my worries at the time."

Conwell also did not object to LeeAnn's testimony because he "didn't want to make any un[due] attention to it by objecting when she got up."

12

Conwell testified that he did not want to run the risk of highlighting the statements. Conwell explained as follows:

"I didn't think—I didn't think that testimony was damaging to Mr. Lowery, so it wasn't based upon—the lack of an objection wasn't based upon the law, whether it would've been sustained or not, it was more based upon the fact that I didn't think that testimony was very damaging, and I didn't want to bring any attention to it—that testimony so that a juror might think that it had some relevance and that the people were related to Mr. Lowery."

But Conwell did make some objections when LeeAnn testified, such as a hearsay objection. He explained his reasoning as follows:

"I believe that you have to be careful about objections and when they should be raised and when they shouldn't be raised. And you shouldn't object to everything because it has—it has a couple of effects, I believe, on jurors. One, if you're standing up every time the State says something that they shouldn't be or leading when they shouldn't be, you know, up and down every other question, I think that irritates a jury. There is some things that get in in the course of being—preparing and working at your table, et cetera, that gets in that maybe you should've objected, but you didn't, and now is not the time to then start objecting to those questions and just kind of let them slide through and try to cover it on cross-examination.

"It's never an intention to try to ruin my client's ability to appeal. It is something that is done during the course of a trial, and sometimes you get up and object, because that's the thing to do at that time. But I think repeated objections throughout a trial, I think has a negative effect on the jury. They think that I'm trying to hide something, and that's the last thing I want the jury to think."

Lowery argues that the testimony was a flagrant violation of the order in limine because David's reference to "a larger association" linked Lowery to gang activity. See *State v. Goodson*, 281 Kan. 913, 925, 135 P.3d 1116 (2006) (introducing evidence that gang members committed illegal acts violated the prohibition on prior crimes evidence).

The State disputes whether the testimony violated the order in limine. The State counters that evidence of gang affiliation is not previous crime or civil wrong evidence prohibited under K.S.A. 2023 Supp. 60-455. *State v. Molina*, 299 Kan. 651, 656-57, 325 P.3d 1142 (2014); *State v. Conway*, 284 Kan. 37, 48, 159 P.3d 917 (2007). And in this case, the evidence does not point to gang membership, argues the State, because the reference to a larger association is too vague. The State correctly notes that the Carrolls never stated that Lowery belonged to a gang or was associated with a gang. The Carrolls never mentioned the name of a gang or testified that Lowery sent gang members to intimidate them.

On appeal, Lowery and the State do not agree on what the district court found in its facts. The district court's order stated: "Lowery argues counsel was ineffective for failing to object to this line of testimony, which obviously violated the order in limine because it alluded to alleged attempts by Lowery to intimidate the Carrolls and attacked Lowery's character by associating him with individuals the Carrolls described as 'undesirables' and 'thugs.'" Lowery contends that this statement means the district court found that the Carrolls' testimonies obviously violated the order in limine. The State contends that the district court summarized Lowery's argument, not that the district court found that the testimony obviously violated the order in limine.

It is readily apparent that the district court did not find that the State violated the order in limine. The district court found that Conwell's lack of objection was strategic. Then the district court jumped to the prejudice prong of analyzing ineffective assistance of counsel, finding that even if counsel's performance was deficient the Carrolls' testimony likely did not prejudice Lowery in light of other evidence. The district court also twice referred to the Carrolls' testimony as a "possible" violation of the order in limine. In short, the district court made no finding that the State violated the order in limine.

14

*Deficient performance*

For purposes of this K.S.A. 60-1507 motion, the question is not whether the testimony violated the order in limine. The question is whether Conwell's lack of objection fell outside the wide range of reasonable professional assistance. That is, Lowery must overcome the strong presumption that, under the circumstances, Conwell's lack of objection was sound trial strategy.

Conwell testified that he believed the State violated the order in limine, but he chose not to object for strategic reasons. The district court found the following: "Counsel's failure to object or seek an evidentiary hearing was based on [trial] strategy." Substantial competent evidence supports the district court's finding. Conwell thought that the man who visited the Carrolls acted on behalf of the other individuals in the SUV. While David said the visitor was an associate of Lowery's, LeeAnn's testimony was less clear. LeeAnn testified that she assumed the visitors knew her husband and that she did not know if they were associated with anyone in this case. Conwell reasonably believed that the jury might not view the testimony as damaging to his client unless he objected to the testimony. Conwell's decision not to object fell within the wide range of reasonable professional assistance.

Lowery also points to direct appeal consequences to argue that trial counsel was ineffective. On direct appeal, our Supreme Court declined to review the Carrolls' testimonies as a violation of the order in limine. *Lowery*, 308 Kan. at 1195-96. The *Lowery* court discussed the same statements presented here: David's reference to "'a larger association'" and the description of "'Mr. Lowery's homeboys.'" *Lowery*, 308 Kan. at 1195. But the *Lowery* court refused to review the issue because Conwell did not object on the grounds that the testimony violated the order in limine. On this K.S.A. 60-1507 motion, Lowery argues that the district court erred by finding Conwell's performance not ineffective. He points to the failure to preserve the issue for direct appeal as evidence that

15

Conwell was ineffective. But here Lowery views Conwell's performance through the "distorting effects of hindsight" which district courts have been precisely directed to avoid. *Evans*, 315 Kan. at 218.

*Prejudice*

Finally, Lowery argues that the district court erred in finding that he suffered no prejudice from Conwell's failure to object. The district court noted that Lowery admitted to driving the SUV and running away after he wrecked the SUV. In denying Lowery's K.S.A. 60-1507 motion, the district court also noted that the defense presented a self-defense theory and hoped to establish that Ray fired first. The district court also held that it was "extremely unlikely" that it would have granted a mistrial based on the Carrolls' testimonies. Lowery argues that his defense was prejudiced by irrelevant gang evidence, citing *State v. Pruitt*, 42 Kan. App. 2d 166, 169, 211 P.3d 166 (2009).

Justin Pruitt was convicted of attempted burglary of Andrew Surmeier's truck. Surmeier testified that he was sitting on a porch when he saw Pruitt walk to his truck. When Pruitt tried to open the door on Surmeier's truck, Surmeier asked what he was doing. Pruitt took off running. Surmeier, who was off-duty at the time, yelled that he was a police officer and chased Pruitt. After Surmeier caught up to Pruitt, he subdued him and learned his name and where he lived. Pruitt broke free, but Surmeier and Officer Herold Keiss went to Pruitt's home and arrested him.

Pruitt testified that he was out for a jog and stopped to do push-ups in front of a blue house. At that moment, he was tackled from behind. He testified that he broke free and went home. Surmeier and Keiss came to his home and arrested him.

At trial, the prosecutor asked Keiss if he was familiar with the suspect or defendant in this case and Keiss stated: "'His name had came up on another incident . . .

16

just prior to this,'" with a defense objection interrupting his sentence. *Pruitt*, 42 Kan. App. 2d at 170. The *Pruitt* court held that, among other cumulative trial errors, this testimony violated the district court's order in limine and prejudiced Pruitt. The *Pruitt* court reversed and remanded because the improper testimony informed the jury that Pruitt had been a suspect in another crime, the jury was not told to disregard the testimony, the prosecution committed other intentional errors, and the evidence against Pruitt was not overwhelming. 42 Kan. App. 2d at 173.

This case stands in marked contrast from *Pruitt*. Surmeier testified that Pruitt tried to open his truck while Pruitt testified that he was doing push-ups near a blue house. After the jury heard that Pruitt was a suspect in another case, the jury convicted Pruitt of attempted burglary. But the State charged Pruitt with battery related to the tussle with Surmeier, and the jury acquitted Pruitt on this charge. *Pruitt* was largely a credibility battle between witnesses on whether any crime had even occurred. That was not the case in the evidence related to Lowery's jury conviction.

Davenport-Ray was shot and killed. Ray testified that he lied to police about shooting back because he was a felon who was not allowed to possess a firearm. Lowery's defense counsel hoped to establish that the inhabitants of the SUV were shooting back in self-defense. The issue was not whether a shooting occurred, but who shot first. Ray's status as a convicted felon illegally possessing a firearm did not give him greater credibility than Lowery. Further, Lowery's credibility on the issue of who shot first was not undermined significantly, if at all, but for the Carrolls' testimony. David's statements about a larger association and homeboys ambiguously implied gang affiliation. LeeAnn's statements were even less clear. Lowery argues that LeeAnn's statements were inaccurate and impeachable. But the Carrolls' assumptions about gang affiliation would not have damaged Lowery's credibility against Ray, a convicted felon. The district court correctly denied Lowery's K.S.A. 60-1507 motion, finding that Lowery failed to demonstrate prejudice. Because Lowery does not show a reasonable probability

17

that the jury would have reached a different verdict, we determine that Lowery's defense counsel's failure to object to David's and LeeAnn's testimonies fell within an objective reasonable standard for a defense counsel.

II. *Was trial counsel ineffective for failing to object during the State's closing argument?*

Lowery argues Conwell's failure to object during the State's closing argument was ineffective assistance of counsel and that the district court erred when it found otherwise in denying his K.S.A. 60-1507 motion. The State argues that Conwell's performance was not deficient and that Lowery fails to show prejudice.

At the evidentiary hearing, Conwell testified as follows:

> "I don't object in closing arguments. Those are grounds automatically to be reviewed by the Supreme Court, and I just—as a matter of course, I typically don't, because I think it interrupts and brings attention to some facts that aren't—really have that much to do with the case, so I did not."

Throughout the hearing, Conwell explained that he did not object because (1) he knew he did not need to object during closing argument to preserve issues, (2) he wanted to maintain credibility with the jury, (3) he did not want an unsuccessful objection to draw undue attention to certain arguments, and (4) he believed he could dispute the State's argument during his closing argument.

In denying Lowery's K.S.A. 60-1507 motion, the district court agreed with Lowery that one of Conwell's rationales was not justified. The district stated: "A failure to object based on the practice of not objecting is unreasonable." But the district court held that Conwell's other reasons for not objecting were strategic and not obviously unreasonable.

Lowery points to four statements by the prosecutor in closing argument as prosecutorial error. He asserts that the State's comments about David Carroll's testimony were error, but Conwell's failure to object precluded appellate review. Then, Lowery correctly notes that the *Lowery* court found prosecutorial error in (1) arguing that Lowery intimidated Tashara Yeargin-Charles, (2) making a golden rule argument, and (3) mischaracterizing DNA evidence. He argues that trial counsel was unreasonable in failing to object to these statements because the lack of objection weighed in the *Lowery* court's analysis of prejudice.

On these points, Lowery simply misreads our Supreme Court's opinion. First, on the subject of David Carroll's testimony, the *Lowery* court did not characterize the issue as trial counsel failing to object during closing argument. Instead, the difficulty for Lowery on direct appeal was that "that testimony came into evidence without objection and was fair game for closing argument." *Lowery*, 308 Kan. at 1206. But, as discussed separately, Conwell's failure to object to the testimony was not ineffective assistance. There is no need to address the same issue a second time under the framework of closing argument error.

The other three issues suffer from a similar misreading. Lowery is correct that the *Lowery* court found prosecutorial error but overstates the holding on prejudice. The State in closing argument incorrectly claimed that Lowery intimidated Yeargin-Charles, which was nearly the opposite of the facts. In doing so, the State misstated Yeargin-Charles' testimony and committed prosecutorial error. 308 Kan. at 1205. The State also committed prosecutorial error with a golden rule argument of telling the jury to "'[t]hink for yourself. What would be your reaction'" if the jury was in the victim's place. 308 Kan. at 1209. And the State grossly mischaracterized the testimony from the State's DNA analyst on probability, which was also prosecutorial error. 308 Kan. at 1209-10. Lowery is correct in noting these prosecutorial errors.

19

But Lowery is incorrect that a lack of objection played a part in the *Lowery* court's prejudice analysis. In *Lowery*, the State argued to our Supreme Court that the closing argument was not outside the wide latitude afforded prosecutors, offering the lack of objection as support for this contention. The *Lowery* court rejected this argument, while noting that an appellate court may consider a failure to object in determining harmlessness. 308 Kan. at 1211. But then the *Lowery* court went on to analyze harmlessness without any consideration of the lack of objection.

The *Lowery* court instead focused on two weeks' worth of evidence, plus the prosecutor's ameliorating statements. The *Lowery* court stated the following:

> "Certainly, one could debate whether the evidence was overwhelming that Lowery committed premeditated first-degree murder, as opposed to felony murder. But there are factors that weigh in the State's favor. First, contrary to Lowery's argument, the errors he preserved for review comprise but a small portion of the trial which extended from July 13th to July 28th. Second, on three occasions during his argument, the prosecutor reminded the jury that statements of counsel were not evidence. For example, the prosecutor said that the jury 'can only consider those things that actually were testified to by a witness, exhibits that were admitted . . . . Those are the things that you can consider in your deliberation process, and only those things.' He also stated, 'And if I say anything during this portion that you don't recall or you do not believe is accurate, as the Judge told you, disregard it.' Likewise, the trial court instructed the jury that statements, arguments, and remarks of counsel were not evidence and should be disregarded if not supported by the evidence.
>
> "On balance, then, we hold that the prosecutorial errors did not rise to the level of denying Lowery a fair trial and do not require reversal." 308 Kan. at 1212.

Thus, while the *Lowery* court stated that a lack of objection *could* factor into its prejudice analysis, its actual analysis relied on the strength of the evidence and the admonitions to the jury. The *Lowery* court did not state that Conwell's lack of objection played a factor in weighing the prejudice to Lowery. And in any event, the appellate

consequences of Conwell's decision not to object would fall squarely within the "'distorting effects of hindsight'" that district courts should avoid. *Evans*, 315 Kan. at 218.

Further, the prejudice cart should not come before the deficient performance horse. Substantial competent evidence supports the district court's finding that Conwell had strategic reasons for not objecting which were not obviously unreasonable. Lowery fails to show that the jury would have reached a different verdict if Conwell had objected. But before that, he fails to show that trial counsel's performance was deficient. Because the district court correctly found that trial counsel's performance was objectively reasonable, we reject Lowery's argument.

But Lowery offers one more point on appeal. Lowery contends that Daniel Dunbar testified that his employment with the district attorney's office was contingent on the outcome of Lowery's trial. Lowery contends that the situation Dunbar found himself in provides context for the instances of prosecutorial error during trial and in closing argument. The *Lowery* court held that Dunbar committed prosecutorial error. Understanding why he committed those errors does not illuminate what defense counsel should have done to address the errors. The district court did not address Dunbar's testimony about the pressures on him as a prosecutor. The district court did not need to address it to determine whether Conwell was ineffective as defense counsel, as these two issues are separate. Lowery fails to connect the stressors placed on Dunbar to Conwell's performance resulting in prejudice.

III. *Was trial counsel ineffective for submitting an erroneous jury instruction?*

Lowery argues that the district court erred in finding no prejudice from an erroneous jury instruction, which defense counsel requested. The State argues that the nature of the evidence and the nature of the error demonstrate that the instruction did not prejudice Lowery.

At the K.S.A. 60-1507 evidentiary hearing, Conwell spoke about the packet of proposed jury instructions that he submitted to the district court. The jury instruction on aiding and abetting liability included the following: "The person is also responsible for any other crime committed in the carrying out or attempting to carry out the intended crime, if the person could reasonably foresee the other crime as a probable consequence of committing or attempting to commit the intended crime."

But our Supreme Court disapproved of this language in *State v. Overstreet*, 288 Kan. 1, 9-10, 200 P.3d 427 (2009). The *Overstreet* court reversed the defendant's convictions, holding that it was clear error to instruct the jury that a defendant is liable if he could "reasonably foresee" that premeditated murder was a probable consequence of his own conduct. 288 Kan. at 14. Because Conwell proposed the jury instruction, the *Lowery* court declined to review the error under the invited error doctrine. *Lowery*, 308 Kan. at 1218.

Conwell testified that he was not aware of *Overstreet* when he submitted his proposed jury instructions. Conwell's proposed jury instruction replicates the Pattern Instructions Kansas from 2013. PIK Crim. 4th 52.140 (2013 Supp.). The Notes on Use discuss *Overstreet* and direct district courts not to use the "reasonably foresee" language for a specific-intent crime. PIK Crim. 4th 52.140. Conwell testified that he did not read that page.

In denying Lowery's K.S.A. 60-1507 motion, the district court leaned heavily on our Supreme Court's discussion of the "reasonably foresee" instruction in *State v. Carr*, 300 Kan. 1, 240, 331 P.3d 544 (2014). The *Carr* court reviewed three earlier opinions to determine when the error is reversible and when it is not. In *State v. Engelhardt*, 280 Kan. 113, 133-34, 119 P.3d 1148 (2005), the victim was stabbed approximately 55 times and the defendant was clearly involved, showing that the defendant acted with intent, and the instruction error did not warrant reversal. In *State v. Cofield*, 288 Kan. 367, 373-74, 200

22

P.3d 1261 (2009), the defendant and cohorts took loaded guns on a car ride, the victims were vulnerable, the defendant confessed to firing at the victims, and many shots were fired. The *Cofield* court determined that reversal was not necessary. In *Overstreet*, our Supreme Court reversed because the evidence suggested that the defendant was a driver but not a shooter and the prosecutor's statements compounded the instruction error. 288 Kan. at 14-15. The district court cited this analysis from *Carr* and concluded that the jury would not have returned a different verdict because of the lack of any discussion of foreseeability and because of the evidence of premeditation.

The district court found that Conwell's performance was deficient for requesting this clearly erroneous jury instruction. The district court stated the following:

> "Conwell erred in recommending the instruction and the Court failed to clarify in the aiding and abetting instruction that the foreseeability clause only related to the Criminal Discharge of a Weapon at an unoccupied dwelling charge and not to the premeditated first degree murder charge. However, this Court finds that while Conwell's performance was deficient, there was not a real possibility that the jury would have returned a different verdict due to the lack of any emphasis on the issue of foreseeability and the evidence of premeditation that was presented."

Lowery argues that this case is like *Calhoun v. State*, 56 Kan. App. 2d 185, 426 P.3d 519 (2018). In *Calhoun*, the prosecutor's entire rebuttal during closing arguments hinged on telling the jury that it could convict if the crimes charged were reasonably foreseeable consequences of aggravated robbery. Also, the jury's questions during deliberations showed considerable confusion arising from the use of the erroneous aiding and abetting instructions. The *Calhoun* court held that trial and appellate counsel's failures to challenge the aiding and abetting foreseeability instruction was prejudicial ineffective assistance of counsel and reversed. 56 Kan. App. 2d at 205-06. Lowery argues that the prosecutor's comments here resemble the prosecutor's comments in *Calhoun*, resulting in the same prejudice from the aiding and abetting foreseeability instruction.

23

Lowery points to the prosecutor's comment that if Lowery's companions shot first then Lowery was guilty, arguing that this did not address the requisite mental state for a premeditated killing. But the prosecutor was not talking about foreseeability. The State began by stating, "If Melvin Ray shot first, then it's self-defense, right, if you believe that, and he's not guilty." The prosecutor's statements did not relate to the erroneous instruction as in *Overstreet* and *Calhoun* but were directed at Lowery's self-defense claim.

Lowery also takes issue with the way the prosecutor attributed all actions during the shooting to Lowery, the prosecutor's use of the phrase "bad stuff," and the prosecutor's phrasing of "random act of violence." Lowery in his brief presents these statements divorced from context. The State correctly argues that the prosecution never suggested that Lowery could be convicted if the murder was foreseeable. In context, none of the prosecutor's statements would lead the jury to convict on a lower culpable mental state. Lowery simply fails to show any comment like the exacerbating comments made in *Overstreet* and *Calhoun* which would warrant reversal.

As in *Carr*, *Cofield*, and *Engelhardt*, the instruction was erroneous but does not warrant reversal. The State never presented a theory of the case where the jury could convict if Lowery could reasonably foresee a murder. The State presented evidence hoping to show, and in closing argued that the evidence did show, that Lowery participated in a plan to kill Ray. While the instruction was erroneous, the jury's verdict would have been the same if the error were not present. Because Lowery was not prejudiced by the instruction error, there is no reasonable probability that the jury's verdict would have been different without the instruction error.

24

IV. *Was trial counsel ineffective for failing to call certain defense witnesses?*

Lowery argues that Conwell's performance was prejudicially deficient because he failed to call witnesses April Timley and Jayden Flowers. He argues that Conwell erred in assuming that Timley's testimony would be inadmissible hearsay. And he argues that Conwell was deficient for never interviewing Flowers, whose testimony could have bolstered Lowery's self-defense claim. The State argues that the district court correctly denied the K.S.A. 60-1507 motion because Timley's testimony was inadmissible and because Flowers' statements to police did not touch on self-defense.

*April Timley*

Conwell interviewed Timley before trial. At the K.S.A. 60-1507 evidentiary hearing, Conwell testified about that interview. He stated that Timley told him Brown and Robbins came to her house after the shooting and told her that Ray shot first. Robbins died before trial and Brown was "in the wind" according to Conwell, so neither were available witnesses.

Timley herself also testified at the K.S.A. 60-1507 hearing. She testified that Brown and Robbins came to her house nearly eight hours after the shooting. Timley stated that Robbins had been shot in the leg and his girlfriend was attempting to dress the wound. Timley testified that Robbins could not believe someone had shot at them. Robbins' statement implied that Ray might have shot first. Timley testified that she was Lowery's aunt and a cousin to Brown and Robbins. Timley explained that she was willing to testify at trial and was present during trial, but Conwell never subpoenaed her.

Conwell testified that he believed Timley's testimony would have been hearsay and he "didn't see a way to be able to get it in." Conwell admitted that the comments would "definitely have been helpful" to the defense while he was discussing the

25

statement's inadmissibility. Conwell testified that he considered exceptions to the hearsay rule but determined that no exception applied. Conwell also agreed that, even if he got Timley's testimony in through a hearsay exception, it might harm the defense's credibility if the jury viewed the testimony as "a family relative will say whatever they needed to say to try to help Mr. Lowery."

Lowery argues that Conwell was deficient for failing to present Timley's testimony under the excited utterance exception to the hearsay rule. K.S.A. 60-460(d)(2). Lowery argues that Conwell misunderstood the timing requirement because an excited utterance does not need to immediately coincide with the event, citing *State v. Brown*, 285 Kan. 261, 173 P.3d 612 (2007). In *Brown*, our Supreme Court approved of an excited utterance made five minutes after a shooting. The *Brown* court quoted a treatise in determining that "'an excited utterance can be made hours after the event.'" 285 Kan. at 295. But the *Brown* court's case citations were of instances where the declarant made the statement between 5 and 15 minutes after the event. 285 Kan. at 295 (citing *State v. McCrady*, 152 Kan. 566, 106 P.2d 696 [1940], and *State v. Morrison*, 64 Kan. 669, 68 P. 48 [1902]). Lowery correctly argues that our Supreme Court has allowed for the possibility that an excited utterance can, in theory, come hours after the event. But Lowery fails to cite a case in which a Kansas appellate court has applied this exception to a statement made hours later.

The State correctly argues that, even if there is no strict time requirement for the excited utterance exception, the *Brown* court set a definitive standard for district courts to apply. "Time is not the indicia of reliability underlying the excited utterance exception; rather the sense of excitement or stress that vitiates the opportunity for reflection makes the statement spontaneous and reliable." 285 Kan. at 295. In denying Lowery's K.S.A. 60-1507 motion, the district court found that it was not clear that Brown's and Robbins' statements made seven to eight hours after the event would qualify as spontaneous utterances arising from excitement carried over from the event. The district court was not

26

convinced that the statements would be admissible as excited utterance hearsay exceptions. Conwell did not perform deficiently for holding the same view as the district court. The district court correctly found no deficient performance.

Lowery also contends that Conwell was deficient for failing to argue the necessity exception to hearsay. Lowery argues that Timley could testify about statements made by Brown and Robbins because Robbins was dead and Brown was an unavailable codefendant. Lowery also asserts that their statements to Timley were made soon enough after the events that they would be admissible under the necessity exception. *State v. Berry*, 223 Kan. 566, 568, 575 P.2d 543 (1978) (a statement made by the hospitalized victim eight days after the fatal shooting was admissible in a murder trial under the necessity exception); *State v. Adams*, 223 Kan. 254, 255-56, 573 P.2d 604 (1977) (statements made the morning after a robbery and three days after the robbery were sufficiently recent to meet the necessity exception). Thus, Lowery argues that the statements made to Timley were timely.

But as the State correctly argues, the timing of the statements was not the focus of the district court's analysis. The necessity exception to hearsay requires that the statement "was made in good faith prior to the commencement of the action and with no incentive to falsify or to distort." K.S.A. 2023 Supp. 60-460(d)(3). Lowery and the State agree that Brown and Robbins made statements to Timley before the commencement of this action, since the State had not yet filed charges.

Lowery, however, argues that there is no indication that the statements were made in bad faith or with intent to falsify or distort. This slightly but crucially misstates the standard. It is not the case that the exception allows in statements when there is no evidence showing the statements were made to falsify or distort the facts. The statements only fall under this exception if there is not even an incentive to falsify or distort. If Brown and Robbins had just shot and killed Davenport-Ray, they would have had an

27

incentive to falsify or distort the facts through their statements to others—including their statement to Timley—that the other car shot first.

The district court held as follows: "The Court is skeptical that Brown and Robbins had no incentive to falsify or distort their statements because they were recently involved in a shooting, and they were talking to Lowery's aunt. This situation is simply not analogous to the case cited by Lowery, which included a victim's statement." The district court correctly found that the statements would not have been admissible under the necessity exception. Thus, Conwell was not ineffective.

*Jayden Flowers*

Flowers testified that he and his friends were sitting at a red light at 17th and Kansas Avenue at about 1 a.m. the night of the shooting. He saw a car and an SUV heading south on Kansas Avenue. He heard two gunshots and then looked up to pay attention and see what was going on. After he looked up, he saw shots firing from the SUV multiple times. He testified that the shots he saw coming from the SUV sounded different from the first two shots that he had heard. He also stated that if the SUV fired first, he would have seen the muzzle flashes in his peripheral vision.

Law enforcement took a statement from Flowers minutes after the shooting, although the police interview was brief. Flowers agreed that the police report on this interview stated that he heard approximately 7 to 10 gunshots and saw muzzle flashes between the two vehicles, with no mention of the initial 2 gunshots differing from the other shots. Flowers never heard from a defense attorney or private investigator. But he would have been willing to testify at trial and his trial testimony would have been the same as his testimony at the K.S.A. 60-1507 hearing.

Conwell received and reviewed the discovery in this case. Lowery testified that Conwell told him about Flowers making a statement to police about seeing two cars shooting at each other. But Conwell never discussed interviewing Flowers or calling him as a witness.

Lowery argues that Conwell's failure to interview or investigate Flowers constituted deficient performance. Lowery argues that Conwell's failure to contact a favorable witness was deficient performance, citing *State v. James*, 31 Kan. App. 2d 548, 67 P.3d 857 (2003). Timothy J. James told his attorney that he was living with the Donahoes and that Mr. Donahoe could provide him with an alibi. James' attorney failed to subpoena him, explaining that Donahoe did not want to testify. The *James* court held that trial counsel's deficient performance prejudiced James because Donahoe's testimony was important to the defense and could have impeached the State's key witnesses. 31 Kan. App. 2d at 554.

Nevertheless, Conwell's performance was not similarly deficient. The police report in discovery alerted Conwell only to the fact that Flowers witnessed gunshots. Flowers' statement to police gave no indication that he saw who shot first or that his testimony could support a theory of self-defense. His testimony at the K.S.A. 60-1507 hearing, although more descriptive, does not establish who shot first. The district court found as follows:  "Flowers' testimony does not clearly work in Lowery's favor. At best, it insinuates that the car may have fired the first shots, but Flowers was not 'paying attention' until after the first shots were fired."

The district court's finding related to Flowers is ambiguous. The district court acknowledged that Conwell should have at least interviewed Flowers but was not convinced that Flowers' testimony would have resulted in a different outcome for Lowery. This statement reads as though the district court found deficient performance for failing to interview a potential witness, but no prejudice. Yet such reading conflicts with

29

the district court's conclusion stating that the only error it found was jury instruction error. Given the importance of testimony related to self-defense, Conwell was deficient for failing to interview Flowers personally or through his investigator and draw out the possibility of favorable testimony. But because the district court correctly found that Conwell's performance did not prejudice Lowery, we reject Lowery's argument.

V. *Was trial counsel ineffective for failing to impeach certain statements from certain witnesses?*

Lowery argues that Conwell's performance was prejudicially deficient because he did not sufficiently impeach three key witnesses. He argues that James Gerety's statement to an investigator conflicted with his trial testimony enough that Gerety was subject to impeachment. He also argues that LeeAnn Carroll's testimony contradicted her husband's testimony and her earlier statements, and that Conwell was deficient for not pointing this out. Finally, Lowery argues that Conwell failed to adequately impeach Ray on whether he admitted to possessing and shooting a firearm. The State points to Conwell's attempts to impeach these witnesses, arguing that Conwell sufficiently attacked their testimony to be effective trial counsel.

*James Gerety*

Conwell's investigator, Ed Brunt, interviewed Gerety before trial. Gerety told Brunt that he observed a small car and an SUV driving slowly side by side southbound on Kansas Avenue. Gerety stated that the vehicles were driving together as if they were talking to each other. He heard three to four gunshots. When he looked up, he heard several more shots and saw flashes coming from the car.

At trial, on direct examination, Gerety testified that he was at an intersection near the shooting when he heard shots and looked up to see shots coming from Ray's car. The State asked Gerety if the vehicles were driving side by side and if they were driving at a

particular speed. Despite being asked directly, Gerety did not testify that the vehicles were driving slowly side by side.

Lowery argues that Conwell was deficient for failing to impeach Gerety because his statements contradict Ray's testimony that the SUV was behind him and started shooting as it passed. At the K.S.A. 60-1507 evidentiary hearing, Brunt testified about his interview with Gerety, confirming that Gerety's statements were helpful to the defense. He explained that Gerety's statements were helpful because they were inconsistent with Ray's version of events. But Conwell never asked Brunt to testify about Gerety's pretrial statements.

Lowery argues that the physical evidence was consistent with Gerety's pretrial statement to Brunt but contrary to Ray's trial testimony. Lowery contends that Ray testified that his window was up and exploded with the first shot. He did not see the SUV passing him. But Ray's testimony was less clear than Lowery argues. Ray actually testified that he did not remember which window broke or if his window was up or down; he thought at first that it was his driver's side window. State's Exhibit 200 established that the driver's side window was rolled down. Gerety's statement to Brunt—that the vehicles were going slowly side by side as if they were talking to each other—would have partially contradicted Ray's trial testimony that his window might have been up.

Conwell extensively cross-examined and recross-examined Gerety, attacking inconsistencies between his 911 call and his trial testimony. Conwell asked if the cars were traveling at the speed limit and Gerety replied, "They could've been. I wasn't paying much attention to that." Conwell also asked Gerety about his conversation with the defense investigator, Brunt.

At the K.S.A. 60-1507 evidentiary hearing, Conwell explained that he spoke with Gerety himself after Brunt interviewed Gerety. Conwell testified that some things Gerety

31

told him were different and his story changed a little bit. Conwell did not see a benefit to impeaching Gerety about something that he had misremembered. Conwell also explained that the vehicles being side by side was inconsistent with Lowery's self-defense claim and he did not want to put on evidence which did not support that theory. Conwell chose to rely on video evidence which he believed showed a flash of gunfire come from Ray's car first before flashes came from the SUV, supporting Lowery's self-defense claim. Conwell made an informed decision about how to cross-examine and recross-examine Gerety. The district court correctly found that Conwell's performance was not deficient.

Further, the district court correctly found that Lowery failed to establish prejudice. Conwell elicited from Gerety the concession that his statements to the 911 dispatcher may have differed from his trial testimony. Gerety conceded the following: "I can't promise that everything I'm giving you is 100 percent accurate. . . . If it was on that 911 call, that's what I said, and I'll stick by that." Thus, the jury heard Gerety state that details of his testimony may be less accurate than earlier statements. But most importantly, Gerety never identified who shot first because he was not paying attention until after he heard gunshots. There is no reasonable probability that the jury would have returned a different verdict if only Conwell had gotten Gerety to say that the vehicles drove slowly side by side as if in conversation.

### LeeAnn and David Carroll

LeeAnn testified that she only heard gunshots. She did not see where they were coming from. She also testified on cross-examination that she never saw any muzzle flashes. Brunt interviewed LeeAnn and she apparently told Brunt that she saw muzzle flashes coming from the car, but not the SUV. LeeAnn told Brunt that she heard two distinct series of gunfire. She described hearing the "pop, pop, pop, pop" of a single gun, then a slight pause, then a volley of gunfire which she assumed was more than one gun.

32

Conwell testified that LeeAnn's statement to Brunt was consistent with Ray's vehicle shooting first. He acknowledged that LeeAnn's statements aligned with a self-defense claim and were relevant to the defense. At trial, Conwell asked her if she heard two distinct volleys of shots, and she said yes. But she answered the next question by saying that she heard all the gunshots at the same time, rather than in separate volleys. When Conwell asked her to clarify, LeeAnn stated, "I'm getting confused." Conwell asked LeeAnn if she talked to his private investigator, and she said yes. But Conwell failed to present Brunt's report to ask whether she heard one volley of shots or two. At the K.S.A. 60-1507 hearing, Conwell could not explain why he did not compare her earlier statements during cross-examination.

Brunt testified at the evidentiary hearing that LeeAnn's statement was helpful to the defense. He explained that the evidence showed that Ray had one gun and that the SUV contained two or three guns. LeeAnn's statement was consistent with the defense theory of a single gun firing first, with two or more guns returning fire after. Conwell never asked Brunt to testify about this aspect of LeeAnn's statements.

The district court found that Conwell's cross-examination of LeeAnn was deficient because her earlier statements to Brunt would have aided Lowery's defense. But the district court found that "there was conflicting testimony regarding what happened, with witnesses hearing and seeing different things. Notably, LeeAnn did not see which car fired the first shots." Thus, the district court found no prejudice to Lowery. In total, the district court's order is slightly inconsistent on this point, however. It found that Conwell was deficient in drawing out LeeAnn's testimony, which would have supported self-defense. But at the end of the order, the district court stated that it found only one deficiency: counsel submitting an incorrect jury instruction. Although the district court found that Conwell's cross-examination of LeeAnn fell below an objectively reasonable standard, it determined that this deficiency did not prejudice Lowery.

33

The district court's finding on prejudice is correct. Lowery argues that LeeAnn told Brunt that she heard one volley of shots first and then she heard return fire. The jury should have heard these statements. But through Conwell's cross-examination, the jury heard LeeAnn say she heard two distinct volleys of shots. The jury also heard her say, in almost the same breath, that she heard all the gunshots come at once in a single volley of fire and return fire. While Conwell could perhaps have done more to draw out which version of events was accurate, he nevertheless placed before the jury the issue of LeeAnn's consistency, reliability, and credibility. There is no reasonable probability that the jury's verdict would have changed if Conwell had impeached LeeAnn with her earlier statements to Brunt, particularly given her saying consistently that she never saw who fired first.

Lowery also argues that LeeAnn's testimony on one point conflicted with David's testimony. David Carroll testified that friends or associates of Lowery came to his house, adding the clarifying statement, "No, not friends of mine." LeeAnn, however, testified that she believed that they were David's friends. On appeal, Lowery places undue emphasis on this discrepancy. He argues the following:

> "[Conwell] failed to bring out the fact that the individuals who purportedly 'threatened' David and [LeeAnn] was David's friend, not any 'associate' of [Lowery]. Establishing that this was David's friend would have impeached David's trial testimony that he did not know this individual, and that the individuals were [Lowery's] 'homeboys.'"

Lowery simply misstates LeeAnn's testimony and overemphasizes its importance. LeeAnn told the jury that she had no idea who these people were, that her husband's job in property maintenance meant he met many people that she did not know, that she led the people into her house believing that her husband knew them, and that she assumed they were friends because they came into the house. But she also associated her visitors

34

with a party in the case as follows: "Maybe. I assumed. But you know what they say about assuming."

LeeAnn's allusion is clear. See, e.g., Ong, "Employers, 'When you assume, you make an ass out of u and me.'—Oscar Wilde (or not?*)," Labor & Employment Report, https://www.laboremploymentreport.com/2024/01/25/employers-when-you-assume-you-make-an-ass-out-of-u-and-me-oscar-wilde-or-not/, Jan. 25, 2024 (explaining that the quote often misattributed to Oscar Wilde is better described as anonymous). LeeAnn's testimony was clear that she assumed on no evidence whatsoever that her husband knew the visitors. This testimony does not contradict David's testimony that he did not know them. It instead demonstrates that LeeAnn's assumption was wrong, which she readily conceded it could have been. There is no probability, reasonable or otherwise, that the jury's verdict would have changed if only Conwell had more thoroughly cross-examined LeeAnn on her admittedly faulty assumptions. Because the district court correctly found no prejudice, we reject Lowery's argument.

*Melvin Ray*

Lowery also argues that Conwell's performance was deficient in failing to adequately impeach Ray's testimony. At trial, Ray testified that after the shooting Detective Kristi Powell interviewed him. Ray testified that he was initially dishonest with Powell, stating, "I lied. I told her, no, I didn't shoot back." Ray explained that he did not tell her he shot back because he was a felon and was not allowed to possess a firearm. Eventually, he admitted to shooting back. On cross-examination, Conwell did not ask Ray about how Powell's statements convinced him to admit to shooting back.

At the K.S.A. 60-1507 evidentiary hearing, Conwell testified that it was not until Detective Powell suggested that Ray shot in self-defense that Ray finally admitted that he had a gun. Powell told Ray during interrogation that she was not interested in referring

him on charges of felon in possession of a firearm because Powell believed that Ray acted in self-defense. Although Conwell brought out testimony that Ray initially lied about shooting because he was a felon in illegal possession of a weapon, Conwell never brought out testimony that Powell implied she would not pursue a charge against Ray or that she suggested self-defense. Lowery argues that this was deficient performance. The district court failed to make a finding on deficiency, but considering how crucial was the question of who shot first and who returned fire in defense, Conwell's performance fell below an objectively reasonable standard.

Nevertheless, the district court correctly found no prejudice. "Ray was a convicted felon who was not supposed to carry a gun. He, therefore, denied shooting the gun until he felt sure he would not be charged with a violation. It is not clear Ray's deception on this issue would have been surprising to a jury." The jury heard that Ray first denied shooting and then changed his story. In his own words, Ray lied. Conwell thoroughly cross-examined him on the details of the shooting. The district court did not state whether Conwell's performance was deficient, skipping directly to prejudice instead. Self-defense was central to Lowery's defense, and Conwell should have elicited testimony that Detective Powell suggested that it was Ray rather than Lowery who acted in self-defense. But even assuming Conwell's cross-examination was deficient in some way, the jury's verdict would have remained the same if Conwell drew out the details of Ray's change in story. Thus, Lowery's argument fails.

VI. *Was trial counsel ineffective in preparing Lowery to testify?*

Lowery argues that Conwell did not fully advise him of the consequences of testifying on his own behalf. Specifically, he points to the State's cell phone evidence showing Lowery's location data as well as his text messages. Lowery argues that Conwell did not sufficiently advise him that by taking the stand he allowed the State to impeach his testimony with this evidence.

36

At the evidentiary hearing, Conwell testified that the trial strategy was self-defense. Conwell told Lowery that it was his right to testify or not testify but, for a self-defense claim, Conwell thought he should testify. Conwell told Lowery that in his experience, "you've got to be able to tell the jury why it is that that took place, and how he felt about it, and whether you were in fear of your safety, and play out the self-defense element." Conwell went over Lowery's testimony with him many times, visiting Lowery many times in the weeks and days before trial, and spending 100 hours or more on the case. Lowery never expressed concerns about pursuing a self-defense claim.

Conwell testified that he was not too worried about the cell phone tower evidence. But Conwell acknowledged the possibility of cell phone evidence coming in if Lowery testified. He reviewed the extraction report with Lowery, showing Lowery's locations. Conwell testified that some of the cell phone evidence supported Lowery's testimony about his locations, but much of the evidence was "twisted" and was not helpful to the defense. Conwell acknowledged that there were some weaknesses in Lowery's account that the State might try to exploit on cross-examination. But Conwell thought the evidence was more supportive of Lowery's version of events. At trial, Lowery testified about his locations throughout the day, allowing the State to introduce cell phone location data.

At the evidentiary hearing, Lowery stated that he did not want to testify at trial, but Conwell told him that he needed to testify to get a self-defense instruction. Lowery further testified that Conwell described the cell phone evidence as a "waste of time." Lowery testified that Conwell never told him the cell phone records could be harmful and never informed him that evidence of his whereabouts could undermine his self-defense claim. On the other hand, Lowery also stated that it was not his opinion that the cell phone records necessarily undermined his self-defense claim. He did not think they were presented correctly. Lowery testified that Conwell never told him whether the cell phone records would help or harm his defense.

37

The district court conceded that Conwell could have better prepared Lowery, but ultimately found no prejudice. The district court's statement is unclear about whether Conwell's performance was deficient. The court stated: "It would have been better if Lowery had been fully informed before making his decision to testify." The district court's conclusion states that it only found one deficiency—the faulty jury instruction—but the text of its order indicates several other findings of deficient performance.

On appeal, Lowery fails to argue that he was prejudiced by Conwell's lack of testimony preparation. Instead, he argues that Conwell's failure to investigate and put on evidence showing that the SUV fired in self-defense would have made Lowery's testimony unnecessary. He ties Conwell's failure to advise him to his arguments that Conwell was deficient in impeaching Gerety, in impeaching LeeAnn Carroll, and in failing to call Timley and Flowers as witnesses.

Thus, his argument on this point relates to cumulative error. Lowery, in essence, argues that if Conwell had properly impeached some witnesses and called other witnesses and had properly informed Lowery about the risk of impeachment with cell phone data, then Lowery might not have testified in support of self-defense. He contends that his claim of self-defense could have come in through other evidence, relieving him of the need to testify on his own behalf. In the context of the trial as it occurred, the district court found that "Lowery's testimony was crucial to the defense's theory of self-defense" and "without Lowery's testimony, the defense's case would have been even weaker."

Lowery does not argue that he would not have testified if the only thing that changed was Conwell's advice. He also fails to argue that his testimony would have been different if Conwell advised him more fully. He does not argue that anything would have changed absent Conwell's deficient performance on advising him about impeachment should he testify. Thus, he fails to show a reasonable probability that the jury's verdict would have been different but for counsel's performance on this issue alone. So, his

argument necessarily fails on its own merit, but can be a factor in cumulative error. Because the district court correctly found no prejudice, we reject Lowery's argument that defense counsel was ineffective in preparing him to testify.

VII. *Was trial counsel ineffective for failing to object to cell phone tower evidence?*

Lowery argues that Conwell was deficient because he did not object to testimony and exhibits presented by Detective Patrick Ladd. The detective presented testimony related to data from Lowery's cell phone, including location data. Lowery argues that Ladd testified to facts which required expert testimony and Ladd was not an expert. The State argues that Conwell chose not to object to the evidence but made the strategic decision to highlight parts of the cell phone data which undermined the State's narrative or helped Lowery's narrative.

At the K.S.A. 60-1507 evidentiary hearing, Lowery and the State both presented expert witnesses. Conwell also testified. The district court correctly determined that Detective Ladd's trial testimony resembled the testimony approved of by our Supreme Court in *State v. Timley*, 311 Kan. 944, 469 P.3d 54 (2020).

*Conwell's testimony*

Conwell testified that he could not recall his rationale for some questions he asked Detective Ladd, but that he had a reason for everything he asked on cross-examination. Conwell remembered that he asked about round-trip time (RTT) data because he thought it showed that the phone was not where the State alleged. Conwell testified that the cell phone data showed different locations and he thought "the jury would pick up on the fact that you can't rely upon where someone is in a particular area." Conwell noted that some RTT data showed that Lowery was in the middle of Lake Shawnee, stating, "So I guess

the point of it was, it was not reliable to show the exact location." Conwell explained that he approached the cell phone evidence with a particular strategy as follows:

> "I thought the cell phone—there are some things that were good and/or bad in there. There are things that were good, and I just thought that that outweighed the bad. So that's why we went into it. I mean, I think it supported what we were trying to say, that Mr. Lowery wasn't at these places when they said that he was at these places, and where he was at these different times, which I was—I thought corroborated his testimony. And that's kind of—I mean, I think that's—I know that's the reason why I got into the cell phone stuff."

Conwell also defended his approach by stating the following:

> "I would agree that there's some that was good and some that was bad. I decided that it was worth us putting it on to help us corroborate where Mr. Lowery was. So it was a decision I made. And sometimes you make the right decisions, and sometimes—I weighed the pros and cons, and I just thought the pros outweighed the cons."

Thus, Conwell strategically chose to cross-examine Detective Ladd on the cell phone location data rather than object to the admission of any cell phone location data.

*Lowery's expert's testimony*

Lowery's expert, Rich Miletic, testified about his evaluation of the cell phone location data presented at trial. Miletic stated that Detective Ladd's testimony ventured into several areas requiring specialized, technical, or scientific knowledge which Ladd did not have. Miletic criticized several aspects of Ladd's testimony and accompanying exhibits. One of Miletic's criticisms was that he disapproved of the State's exhibits which showed cell phone towers, with blue shaded areas drawn in arcs around the towers. He argued that no data allowed Ladd to draw coverage area for those cell phone towers. He testified that an accurate representation of coverage would require driving around with

test equipment to map out coverage, which is time-consuming and expensive. He testified that the blue shaded areas on the State's exhibits were not accurate representations of cell phone tower coverage.

But Miletic misread Detective Ladd's testimony. Ladd's testimony was from the perspective of law enforcement starting with a rough location when searching for someone or something. Ladd testified that he has done 300 cell phone extractions since 2009. He testified that having RTT data is better than relying solely on sector data when "having to look for somebody or determine their whereabouts." Ladd testified that the shaded areas on Exhibit 314 were drawn by software, not drawn by him. But Ladd admitted to adjusting the shaded areas for readability, that is, so the street and place names would be visible. When Conwell asked about the blue shaded areas, Ladd testified that he could ascertain which tower and sector is utilized by the handset, and he could place the handset within a sector.

Answering Conwell's questions, Detective Ladd testified that the blue areas did not represent the range of the cell tower but indicated that the device was somewhere in that sector. Ladd stated that the range of a cell tower could extend more than 40 miles. Yet the blue shaded areas on the exhibits only extended for several blocks within Topeka. Ladd testified that if he were looking for someone or something, given only the sector data from a cell phone showing which tower the phone connected to, then he would search within that sector. Thus, Miletic's testimony did not address the same issue as Ladd's. Miletic stated that the blue shaded areas were not accurate to a cell tower's radius. Ladd never testified that they were. Ladd's testimony gave the impression that the blue shaded areas on the exhibits were useful tools for guiding law enforcement searches.

*The State's expert's testimony*

The State's expert, Patrick Siewert, testified that he conducted a peer review of Detective Ladd's cell site analysis and cell phone analysis. Siewert testified generally that Ladd's testimony matched Ladd's qualifications and the data available. Specifically, Siewert testified that Ladd was "knowledgeable with regard to his qualifications in terms of being able to analyze and appropriately present this data. And in looking at the actual data itself specific to this case, in comparing that to his testimony, it did appear to be accurate to me."

Siewert noted that Detective Ladd did misstate a fact when Ladd testified that a device will always connect to the closest cell tower. But Siewert acknowledged that Ladd corrected this testimony when he later said that a cell phone connects to the tower with the best signal, which may or may not be the closest. Overall, Siewert testified that Ladd used sufficient data to provide his testimony and that Ladd's methodology was reliable. Siewert also pointed out that the shaded blue areas were the result of combining two data sets: the cellular carrier's data and the data from the cell phone. The two data sets tended to confirm each other. Thus, Siewert confirmed that the shaded areas Ladd put on the exhibits were not meant to represent cell tower coverage, but rather an area in which that cell phone may be located.

Miletic had other concerns with Detective Ladd's trial testimony, apart from the shaded blue areas on exhibits. Ladd testified that an iPhone app might determine the phone's GPS location. When asked why, Ladd explained, "Generally, it's for performance issues, as well as app-based. It wants to know your location so it can spin up relevant ads for your location while you're on your device," noting that a phone in Topeka would get ads for Topeka businesses instead of New York City businesses. Miletic critiqued Ladd's statement as follows:

"I believe he's getting into some details that—that really is attuned to, you know, the Apple Corporation and what they do and how they handle that information. That is more—you would have to have knowledge of how Apple handles those, how they report the location information back to their servers, how they handle that information. I don't think he knows that. I could be wrong."

Simply put, this criticism had nothing to do with the facts of the murder trial. There is no reasonable probability that the jury's verdict would have changed if Conwell had objected to Detective Ladd's testimony on how Apple advertises based on location data.

Miletic also criticized Detective Ladd for discounting a plotted location. The State asked Ladd to illustrate principles by using an example, referencing a tower on the map which was not part of the case. Ladd explained that cell towers use three antennas to create 120-degree sectors and a phone would not connect to the antenna pointed in the opposite direction. When asked about this testimony, Miletic stated, "I believe there was a point that is discarded because it happened to be behind or on the absolute opposite side." Miletic did not believe that a point should be discarded because it was on the opposite side of an antenna.

Again, Miletic misread the testimony. Lowery repeats this mistake in his appellate brief when he asserts "on page 2002 of Volume 22, Ladd discounted an RTT location that was in the opposite direction of where [Lowery]'s cell phone was supposedly located." Ladd did not discount any location related to Lowery's phone because he was discussing an example, not the actual data from the case. His testimony did not relate at all to discounting locations of Lowery's phone. At a different point in testimony, Ladd discounted a location for Lowery's phone, but for different reasons. Ladd testified that the Pandora app plotted a location for Lowery's phone in the city of Lawrence, but Ladd discounted that location completely because the phone data showed a zero confidence factor. Miletic's critique simply fails to address Ladd's testimony.

43

Miletic also criticized Detective Ladd's knowledge of Apple's navigation switches, his knowledge of the accuracy of RTT data, and his knowledge of how confidence factors are generated. Miletic testified it was highly improbable that the phone could travel from a point in the middle of Lake Shawnee to a point nearly a mile away in less than one minute. He testified that this goes to the reliability of the iPhone extraction report. Lowery focuses on Miletic's testimony to argue that Ladd testified beyond the scope of his knowledge and Conwell should have objected.

*The district court's application of* Timley

The district court correctly rejected this claim, based on our Supreme Court's holding in *Timley*. In *Timley*, Detective Broxterman testified about the relative position of Timley's phone throughout the day of the crime. 311 Kan. at 946. Broxterman plotted the trajectory of Timley's phone based on information he received from Sprint that included which cell tower and which side of the tower the cell phone had accessed. Broxterman testified that shortly before the crime, Timley's phone accessed a cell tower in Topeka that was 2.63 miles from the crime scene. Broxterman explained that the data provided merely an estimate, not a definitive fact. The *Timley* court approved of Broxterman's exhibits and accompanying testimony because they "did not require any specialized knowledge or expertise beyond that which he was demonstrated to possess." 311 Kan. at 954. The district court reviewed *Timley* and considered whether Lowery showed that the testimony at issue here went beyond the specialized knowledge or expertise that Ladd possessed.

The district court acknowledged Miletic's critiques of Detective Ladd's testimony. But Miletic's critiques do not further Lowery's argument that Conwell provided ineffective assistance of counsel. Miletic stated that the blue shaded areas on exhibits did not represent cell tower coverage, but Ladd's testimony shows that they were not meant to. Miletic criticized Ladd's knowledge of why apps track location data, but Ladd gave

44

only a general rather than definitive statement about ads tailored to locations which did not relate to the issues at trial. Miletic testified that Ladd should not have discounted a location when Ladd did not discount a location but illustrated a possible example. Miletic demonstrated that Ladd's knowledge of the technology involved was limited and that there was technical or specialized knowledge that Ladd did not possess. But Ladd's statements, when read in context, contained caveats and Ladd acknowledged his limitations. The district court used the example of Ladd admitting that he did not know how the software generated confidence levels.

Further, Conwell thoroughly cross-examined Detective Ladd, exposing weaknesses in the State's evidence and demonstrating that the cell phone location data had limited reliability. He pointed specifically to data showing that the phone was in the middle of Lake Shawnee as evidence of unreliability. The district court found that Conwell was not deficient in failing to object to Ladd's testimony. The district court found that Conwell clarified through cross-examination that the location from the apps show only that the cell phone was in the general area and that it was difficult to provide a specific location for the iPhone. Substantial competent evidence supports the district court's findings. Ladd's testimony and exhibits would have been admissible under *Timley*.

Conwell's strategy was not to object to the admission of the evidence, but to attack its reliability. This strategy was not objectively unreasonable, and Conwell's performance was not deficient. Further, as the district court correctly stated, even if Conwell were deficient for failing to object to Detective Ladd's testimony and exhibits, there is no reasonable probability that the jury would have reached a different verdict. Because Lowery does not show that Conwell's performance was deficient and because Lowery fails to show prejudice, we reject Lowery's argument that defense counsel was ineffective for failing to object to cell phone tower evidence.

VIII. *Was trial counsel ineffective for failing to consult or call a cell phone expert?*

Lowery argues that Conwell was deficient because he did not consult a cell phone expert in preparation for trial. The State argues that Conwell's choice to request funding from the Board of Indigents' Defense Services (BIDS) for a private investigator and a DNA expert, but not a cell phone expert, was trial strategy and was not objectively unreasonable.

At the K.S.A. 60-1507 evidentiary hearing, Conwell testified that he did not consult a cell phone expert before trial because he did not think that it was necessary. Conwell admitted that "probably it would've been helpful to have an expert," but he instead pointed out some erroneous data at trial to show that "it was not reliable to show the exact location." Conwell explained his decision not to consult an expert as follows:

> "I didn't think I needed one, and I didn't think I could get one approved on speculation. You know, money is tight with BIDS, and if it isn't apparent for the need, you're not going to get any funds to do it. And at the time, when we were preparing, and whether I needed one, I didn't think there was a need for that. I was spending money on an investigator, DNA, et cetera. So I didn't think I needed an expert on the cell phone."

Conwell also testified that he believed that some cell phone evidence and location data helped corroborate Lowery's testimony about where he was that day and night.

Lowery argues that Conwell's performance was deficient, citing *Mullins v. State*, 30 Kan. App. 2d 711, 46 P.3d 1222 (2002). A jury convicted Thomas B. Mullins of aggravated criminal sodomy and aggravated indecent liberties with a child. The *Mullins* court found trial counsel was ineffective for failing to consult with or procure an expert witness in a child sexual abuse case. 30 Kan. App. 2d at 717-18. At Mullins' K.S.A. 60-1507 hearing, Mullins presented testimony from two expert witnesses: (1) A criminal defense attorney who stated reasonable trial counsel would have consulted with an expert

46

in preparation for trial; and (2) an expert on the subject of interviewing child sex abuse victims who stated the victim's interviews were not reliable.

In contrast, Lowery presents no testimony that reasonable trial counsel would have consulted a cell phone expert in preparation for trial. And Lowery's cell phone expert testified that Detective Ladd lacked the expertise to offer opinions about cell phone location, but he did not show that the data itself was unreliable.

As the State correctly argues, there are additional differences between this case and *Mullins*. In *Mullins*, the K.S.A. 60-1507 hearing testimony established that the use of experts in child sex abuse cases was crucial and the need for an expert was well known at the time. But the district court found that failing to consult an expert was not deficient because "'few attorneys would have done so at the time,'" a finding which the *Mullins* court reversed as directly contrary to uncontroverted testimony. 30 Kan. App. 2d at 717. This fact was compounded by Mullins' counsel's inexperience and his failure to provide any strategic reason for not consulting an expert. 30 Kan. App. 2d at 714-15, 717. In contrast, Conwell testified to being an experienced attorney who deliberately chose to pursue a private investigator and DNA expert as part of his strategy, rather than a cell phone expert.

Finally, in *Mullins*, the need for an expert was central to the case. Mullins was convicted primarily on the victim's testimony. The expert witnesses at the K.S.A. 60-1507 hearing sharply criticized the testimony at Mullins' trial, with one expert testifying "he would be surprised if Mullins would have been convicted" if he had the adequate assistance of an expert. 30 Kan. App. 2d at 713.

Here, the assistance of an expert was far less central to the case. In *Mullins*, nearly the only evidence that a crime occurred was the child victim's unchallenged testimony. But the cell phone location data was not the primary evidence supporting Lowery's

47

murder conviction. The State presented evidence that several guns were used to shoot Davenport-Ray. Bullet holes in the car and SUV, plus witness testimony, established that between 15 and 20 shots were fired. Blue disposable latex gloves gave the jury some indication that the shooting was planned. Lowery admitted that he drove the SUV and fled after the wreck. Thus, Conwell's strategy to focus his attention on matters other than the cell phone location data was not objectively unreasonable. Because Lowery fails to show that Conwell's performance was deficient, we reject this argument.

IX. *Did the alleged errors result in cumulative prejudice?*

Lowery argues that all errors during his trial accumulate to show that he did not receive a fair trial. The State argues that this court should not view all errors together and that the defense counsel deficiencies do not accumulate to show that Lowery was prejudiced by ineffective assistance.

No trial is perfect. Some trials are farther from perfect than others. Lowery paints an unsettling picture of a trial riddled with errors. He fails by the narrowest of margins to show that these errors deprived him of a fair trial.

First, he notes that our Supreme Court identified harmless errors on direct appeal.

"We have identified three instances of prosecutorial error: the prosecutor violated the order in limine and misstated the evidence in arguing Lowery intimidated Yeargin-Charles; the prosecutor made an improper golden rule argument; and the prosecutor misstated and mischaracterized the DNA probabilities. In addition, we found the following trial errors: Lowery's statutory right to be present at the hearing on his motion in limine was violated; and the district court erred in refusing to redact the video recording of Lowery's law enforcement interview to remove references to a 50-year sentence, to remove an officer's explanation of the felony-murder law, and to remove the statements implying that Lowery had previously been in prison." *Lowery*, 308 Kan. at 1243.

Lowery argues that our Supreme Court's guidance on cumulative error analysis instructs this court to combine the errors identified on direct appeal and in this motion. Cumulative error is reversible when "'the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. No prejudicial error may be found under this cumulative effect rule, however, if the evidence is overwhelming against the defendant.'" *State v. Williams*, 299 Kan. 1039, 1050, 329 P.3d 420 (2014).

Lowery argues that the totality of the circumstances should include those identified on direct appeal, with this court analyzing whether the addition of ineffective assistance of counsel tipped the scales to deny him a fair trial. Lowery cites federal and out-of-state caselaw to support combining all errors, not just those available on a habeas motion. See *People v. Fleegle*, 295 A.D.2d 760, 761-63, 745 N.Y.S.2d 224 (2002) (reversing based on the cumulative effect of trial errors and ineffective assistance of counsel); see also *Cain v. Chappell*, 870 F.3d 1003, 1024-25 (9th Cir. 2017) (analyzing all errors combined); *Pantano v. Donat*, No. 3:08-CV-00685-ECR, 2012 WL 3929515, at *57 (D. Nev. 2012) (same) (unpublished opinion); *Palmer v. Ward*, No. CIV-05-934-R, 2006 WL 1966590, at *18 (W.D. Okla. 2006) (same) (unpublished opinion). The State responds that this court should decline to analyze cumulative error this way because Lowery fails to cite a Kansas case, but the State similarly fails to cite any case showing that this court could not, or even should not, analyze all errors in their totality.

Lowery argues that some issues he raises in this motion dovetail with issues decided on direct appeal. The *Lowery* court found prosecutorial error in violating an order in limine and misstating evidence relating to the intimidation of Yeargin-Charles. 308 Kan. at 1243. But the *Lowery* court declined to address David and LeeAnn Carroll's testimony on attempted intimidation because Conwell did not object. 308 Kan. at 1196, 1206. The *Lowery* court hinted that, although it would not review such claim, the prosecution may have erred by inflaming the jury with insinuations that Lowery

threatened potential witnesses. 308 Kan. at 1206. Lowery now argues that those issues are interrelated.

Lowery's brief also provides what he believes is relevant background for some errors, including prosecutorial error. Dunbar testified that he believed his continued employment with the Shawnee County district attorney's office was contingent on the outcome of Lowery's trial. He explained as follows:

"[T]hat was more of my feeling. That was never conveyed to me.

"It was communicated to me prior to the commencement of the trial from the former Chief Deputy Jacqie Spradling, she called into question my preparation for the trial. I referred her to our case management system called JustWare. I was on vacation at the time when she called me, and rather than trying to explain to her the details of my preparation for the trial—which I had prepared one other time prior—rather than attempt to explain in detail my preparation, I referred Spradling to our case management system called JustWare where I keep detailed notes of all of my activities, my preparation, my communications as it relates to each and every one of the cases that I prosecute. Ms. Spradling was agitated in me referring her to that system. She made certain derogatory comments regarding my referencing that system; I sensed her frustration that I was referring her to that system. Rather than giving her details of every step of my preparation, I thought it was best to look at the actual documents rather than me having to rely on my memory overtime while I was on vacation driving down the turnpike. So it was based on that interaction.

"I returned to the office the next day, continued my case preparation, Ms. Spradling, it was obvious to me, was not having any direct contact with me. I'd worked with her for a number of years, I [had] become very familiar with that.

"So yes, it was my sense that since she, being the chief deputy, had—clearly had influence over Mr. Taylor's staff, that depending on the outcome of the trial, I could very well find myself in a situation.

"Again, no one ever conveyed that to me. That's just my—was human nature for me to feel that way. That was 20-some years of working in the prosecutor's office. Again, I want to be clear, no one told me that winning or losing would result in a change of employment, that was just my feeling . . . ."

After the jury convicted Lowery, Dunbar nevertheless resigned even before the hearing on Lowery's motion for a new trial. But Dunbar appeared at the new trial hearing anyway, to testify about a personal insult he uttered at the jury trial and whether he was insulting Conwell or stating a perceived insult from Conwell. *Lowery*, 308 Kan. at 1197-98. At points, the *Lowery* court hinted that Dunbar may have committed errors which did not draw an objection and it was "a close call" whether he stayed within the wide latitude afforded to prosecutors. 308 Kan. at 1206, 1208. And the *Lowery* court found three prosecutorial errors, albeit harmless ones. 308 Kan. at 1243.

Dunbar's testimony at the K.S.A. 60-1507 evidentiary hearing sets this behavior against the backdrop of "derogatory comments," "frustration," and an apparently fractious relationship with a chief deputy who our Supreme Court has since disbarred for separate reasons. See *In re Spradling*, 315 Kan. 552, 509 P.3d 483 (2022). Lowery cannot show that his attorney's performance was deficient because opposing counsel acted under stressors. But given the context, Lowery claims that his defense counsel should have been more on his toes and this claim is not without a certain appeal.

The district court found numerous possible errors, but inconsistently averred only one instance of harmless ineffective assistance of counsel: proposing a defective jury instruction. This statement conflicts with other statements in its order that Conwell's performance was deficient in other respects. In total, Conwell's performance was deficient on the following issues: (1) submitting a defective jury instruction; (2) failing to interview Flowers as a potentially favorable witness; (3) failing to present the jury with LeeAnn's statements to Brunt about hearing fire and then return fire; (4) failing to elicit testimony about Detective Powell's statements to Ray that he would not be charged with felon in possession and that he likely fired in self-defense; and (5) failing to adequately prepare Lowery to testify on his own behalf. These errors were individually harmless. But Lowery argues that they combine with errors identified on direct appeal and the State argues that they do not.

The parties fail to provide support for either merging or not merging these errors with the errors identified on direct appeal. One of them clearly does not accumulate with other errors, and our Supreme Court's guidance on that one error might help to illuminate the others. That is, unpreserved jury instruction issues which are not clearly erroneous may not be considered in cumulative error analysis. *State v. Waldschmidt*, 318 Kan. 633, 662, 546 P.3d 716 (2024).

The *Waldschmidt* court found two prosecutorial errors and one unpreserved jury instruction error. 318 Kan. at 659. The *Waldschmidt* court concluded that cumulative error could only include the two prosecutorial errors in its analysis but not the instruction error. 318 Kan. at 662. The *Waldschmidt* court began with K.S.A. 22-3414(3):

> "'No party may assign as error the giving or failure to give an instruction, including a lesser included crime instruction, unless the party objects thereto before the jury retires to consider its verdict stating distinctly the matter to which the party objects and the grounds of the objection unless the instruction or the failure to give an instruction is clearly erroneous.'" 318 Kan. at 659.

The *Waldschmidt* court held that, if an unpreserved jury instruction which is not clear error cannot result in reversal on its own, then it cannot result in reversal as part of cumulative error either. The *Waldschmidt* court noted that Kansas appellate courts had included instruction errors in cumulative error analysis even when the instructions were not clearly erroneous. The *Waldschmidt* court held that this practice violates the instructions of K.S.A. 22-3414(3) not to assign error to instructions unless (1) the complaining party objected by stating a specific ground or (2) the instruction or failure to give an instruction was clearly erroneous. 318 Kan. at 660, 662.

Thus, this court must exclude the instruction error from its analysis of cumulative error here. As it happens, *Waldschmidt* does not change much in Lowery's case. If this court were to include the jury instruction error in cumulative error, as in the pre-

*Waldschmidt* days, the error does not combine with the other errors. None of the prosecutorial errors relate to the jury instruction's error on foreseeability. None of the evidentiary errors would lead the jury to convict Lowery because he could reasonably foresee the murder. The jury instruction error stands alone. Thus, *Waldschmidt* has a procedural and legal impact in directing this court not to consider one of the errors in cumulative error analysis. But in a real and practical sense, *Waldschmidt* does not change much for Lowery because the outcome would be the same.

But a second look at *Waldschmidt* does not hurt, both for what our Supreme Court says and what it does not say. The *Waldschmidt* court's reasoning relies on the language of the statute for excluding consideration of unpreserved jury instruction error. "To be sure, this court has at times—but without discussion—lumped unpreserved instructional issues into its cumulative error pot, even though very few resulted in conviction reversals. Regardless, unreasoned judicial repetition does not create law when it directly conflicts with a statute. [Citations omitted.]" 318 Kan. at 660. Thus, consideration of an unpreserved (but not clearly erroneous) jury instruction issue was inappropriate in cumulative error analysis because it violated our Legislature's mandate. Although appellate courts may have done so in the past, the practice should cease because of the statutory language forbidding it. "To recap, we find no authority for our prior practice given the statutory restriction. We hold an unpreserved instructional issue that is not clearly erroneous cannot escape K.S.A. 2022 Supp. 22-3414(3)'s confines to be considered in a cumulative error analysis." 318 Kan. at 662. The *Waldschmidt* court related the category of error already excluded from cumulative error analysis. It noted that appellate courts already do not consider unpreserved claims of erroneously admitted evidence in cumulative error because K.S.A. 60-404 prohibited such consideration. Thus, an unpreserved jury instruction joins that short list, unless the instruction is clearly erroneous.

Ultimately, Lowery fails to show that Conwell's performance deprived him of a fair trial, although it is a close call. The jury reviewed evidence that the occupants of the SUV fired multiple shots at the Dodge Charger car in which Davenport-Ray was a front seat passenger. The intensity of the shooting and the presence of blue latex gloves gave the jury reason to believe that the shooting was premeditated. Lowery admitted to being the driver of the SUV. He presented evidence of self-defense, but the jury did not accept his claim. Some of defense counsel's strategic choices, in hindsight, may have worked better if Conwell had made a different choice. But hindsight does not control this court's analysis. *Evans*, 315 Kan. at 218. Only the faulty jury instruction was error. Although the trial could have been smoother, Lowery fails to show a reasonable probability that the jury verdict would have been different absent the errors.

For the preceding reasons, we affirm the district court's denial of Lowery's K.S.A. 60-1507 motion.

Affirmed.